**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| B.D., <br><br> *on behalf of herself and all others similarly situated,* <br><br> Plaintiff, <br><br> v. <br><br> Watson Clinic ASC, LLP <br><br> Defendant. | Case No. 8:26-cv-1977 <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff B.D.,[1] at all times relevant herein, has been a patient of Watson Clinic ASC, LLP ("Watson Clinic" or "Defendant"), and brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

1.    Plaintiff B.D. brings this case to address the Watson Clinic's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties such as Google,

---

[1] Plaintiff B.D. brings this action anonymously out of a desire to protect her personal health information under the Health Insurance Portability and Accountability Act of 1996 and Florida law. Plaintiff's allegations include specific details concerning her medical conditions, medical treatments, and appointments with specialists.

Inc. and others ("Google" or "Unauthorized Parties"), without consent, through the use of tracking software that is embedded in Defendant's web properties.

2. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, the mishandling of which can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

3. The Watson Clinic owns and controls www.watsonclinic.com ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating specific physicians and treatment facilities, communicating medical symptoms, conditions, and treatments via the search bar and related webpages, signing up for events and classes, and more.

4. The Website also contains the MyChart Patient Portal, which Defendant encourages patients to register for and use in conjunction with their medical care.

5. Unbeknownst to its patients, the Watson Clinic installed tracking technologies ("Tracking Tools") onto its Website, including the MyChart Sign-In page that redirects patients to the MyChart Portal log-in.

6. Although Plaintiff is presently unaware of every type of pixel and tracking tool the Watson Clinic deployed on its Website during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party that: (1) has not executed a HIPAA-

compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

7.    As used herein, Tracking Tools includes: Google Analytics, and similar tools offered by Google in conjunction with its marketing products and other platforms such as DoubleClick or Google Ads.

8.    These Tracking Tools intercept, record, and disseminate patients' communications with the Watson Clinic via its Website. Operating as designed, the Tracking Tools commandeer patients' web browsers and surreptitiously disclose their private communications to Google as they use the Website.

9.    Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for their specific health conditions and medical treatments, and the booking of medical appointments with a specific physician.

10.    More specifically, the Watson Clinic surreptitiously shared several types of private and protected patient information with Google, including but not limited to:

a.  The specific medical services that patients searched for in conjunction with their treatment and care, including physician specialties and treatment option;

b.  Names of treating physicians and providers;

c.  Patient status and the fact that a user has requested an appointment;

d.  Event and Class registrations, such as breast feeding classes;

e.  The specific location and office the patient is seeking care from;

f.  The exact words and phrases that patients type into the search bar;

g.  Every webpage the patient visited, including descriptive URLs that contain details about the condition, physician, sought treatment, and more.

11.     The Private Information that the Watson Clinic transmitted to Google reveals the fact that a particular individual is a patient seeking medical treatment, the type of medical care being sought (such as treatment for cancer or depression), and other details concerning their medical care.

12.     The information that the Watson Clinic collected and disclosed via Tracking Tools is not anonymous. For example, Google "stores users' logged-in identifier on non-Google websites . . . in its logs . . . . Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[2]

---

[2] *See Brown v. Google LLC*, 685 F. Supp.3d 909 (N.D. Cal. 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google may also connect user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 02, 2026) ("Such PHI may include, for example, an individual's IP address . . .").

13. Simply put, the information that the Watson Clinic transmitted to Google is personally identifiable.

14. The Watson Clinic is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

15. In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies transmit personally identifying health information to third parties, both on the "public" portion of the website and within the password-protected patient portal, and that such information should not be transmitted without a HIPAA-compliant written authorization from patients.

16. The Federal Trade Commission ("FTC") has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

5

17.    In addition, Florida law prohibits the disclosure of patient medical records unless prior written authorization has been given by the patient or under specifically defined circumstances which do not apply here. Fla. Stat. Ann. § 456.057(7).

18.    Florida also requires that all "records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record. Employees of records owners shall be trained in these policies, standards, and procedures." Fla. Stat. Ann. § 456.057(10).

19.    Despite these clear laws and regulations, the Watson Clinic has essentially planted a bug on patients' web browsers, which forcibly and invisibly discloses their private and confidential communications to Unauthorized Parties. This is the electronic equivalent of looking over the shoulder of each visitor for the entire duration of their website interaction.

20.    The Watson Clinic did not disclose the presence of these Tracking Tools to its patients and Website users.

21.    Moreover, medical patients simply do not anticipate or expect that their trusted healthcare provider will send their private communications, PHI, or PII to Unauthorized Parties, let alone Google, which has a sordid history of privacy violations in the pursuit of ever-increasing advertising revenue.

22.    Neither Plaintiff nor any other Class Member signed a written authorization permitting the Watson Clinic to send their Private Information to Google.

23.    The Watson Clinic breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia,: (i) aiding and/or procuring the interception of Plaintiff's and Class Members' communications; (ii) failing to remove or disengage technology that was known and designed to share patients' information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google, or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like Google Analytics; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

24.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

25.    Plaintiff seeks to remedy these harms and brings causes of action for (1) violation of the Florida Security of Communications Act, Florida Statutes § 934.01, et seq.; (2) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) - unauthorized interception, use, and disclosure; (3) breach of confidence; (4) invasion of privacy (intrusion upon seclusion); (5) unjust enrichment; and (6) breach of implied contract.

7

## PARTIES

26.    Plaintiff B.D. is a natural person and citizen of Florida where she intends to remain.

27.    Defendant Watson Clinic ASC, LLP, is a limited liability partnership with its principal place of business located at 1600 Lakeland Hills Blvd, Lakeland, Florida.

28.    Defendant is a Florida-based healthcare provider that offers "a team of close to 300 medical providers who represent over 40 medical and surgical specialties."[3]

29.    Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

30.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

---

[3] https://www.watsonclinic.com/specialties (last visited June 02, 2026).

31.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

32.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

33.     Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

<u>COMMON FACTUAL ALLEGATIONS</u>

**A. The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

34.     In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information." 78 Fed. Reg. 5566 (January 25, 2013).

35.     As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered PHI under HIPAA, information did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual." 78 Fed. Reg. at 5598. Instead, "[i]f the information is tied to a covered entity, then it is protected health information by

9

definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected ... in accordance with the HIPAA rules." *Id.*

36. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[4]

In other words, HHS has expressly stated that entities like Defendant that implement Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

37. The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as***

---

[4] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 02, 2026) (emphasis added).

***expressly permitted or required by the HIPAA Privacy Rule.*** [5]

38.    Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and thus Defendant still has an obligation to protect information on non-password protected (i.e., "unauthenticated") webpages. Citing to the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."[6]

39.    The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[7]

40.    In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

---

[5] *Id.*

[6] *Id.*

[7] *Id.* (emphasis added).

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[8]

## B. Underlying Web Technology

41. To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

42. Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

43. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

---

[8] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited June 02, 2026).

44.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among

other data.[9]

45.     Every website is comprised of "Markup" and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

46.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of users' transmissions to Google's own web servers.

47.     By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website. As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Physician Search" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

48.     Similarly, when a patient visits www.watsonclinic.com and clicks on the "Physician Search" tab, their web browser sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP

---

[9] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

Response, which loads the Markup for that particular webpage. As depicted below,

patients only see the Markup, not Defendant's Source Code or underlying HTTP

Requests and Responses.



*Figure 1. The image above is a screenshot taken from the patient's web browser upon visiting https://www.watsonclinic.com/physician-search/. The purpose of this image and other images included in the complaint is to illustrate what happens  when patients use Defendant's website.*

**C. The Watson Clinic's Use of Google's Tracking Tools.**

49.    Tech companies like Google offer several online tracking products, including SDKs and tracking pixels,[10] to help drive ad revenue.  For example, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve Defendant's advertising network and capabilities by providing extensive data points on specific individuals.

50.    One of these SDKs and tracking pixels is Google Analytics.  Google pitches Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[11]  Google Analytic allows companies that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "take action to optimize to optimize marketing integrations across Google's advertising and publisher tools," and "quickly analyze your data with an easy-to-use interface and shareable reports."[12]

51.    Google Analytics is incorporated into third-party websites and apps, including Defendant's Website, by adding a small piece of JavaScript code to each

---

[10] A tracking pixel is a script that runs in the background and collects information from the tracker about the user. The tracker pixel instructs the browser to send the users' IP address, along with identifying data such as cookies and device information to a third-party. This allows the tracker to monitor user activity and surreptitiously gain insight about the users' behavior on the site.

[11] https://marketingplatform.google.com/about/analytics/(last visited June 02, 2026).

[12] *Id.*

16

page on the site. This code immediately intercepts a patient's interaction with the webpage every time the patient visits it, including what pages they visit and what they click on. The code also collects PII, such as cookies that identify specific individuals, device information, and more.

52. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics enables companies and advertisers, including Defendant, to customize the processing of the data, by for example, allowing them to apply filters.

53. After the data has been processed and stored in the database, Google uses the data to generate reports from the webpages. These include reports on acquisition (e.g., information about where Defendant's online traffic originates and methods by which users arrive at Defendant's website), engagement (e.g., measuring user engagement on Defendant' websites by the events and conversion events that users trigger), and demographic's (e.g., classifying Defendant's users by age, location, gender, and language, in conjunction with the interests they express through their online browsing and purchasing activities).

54. In addition to using the data collection process mentioned above, Google Analytics sends requests to Google, along with unique identifier cookies (e.g., 3PSID, 3PAPISID, 3PSIDCC, and NID) to track behavior across websites and link it to advertising audiences and targeting signals. These cookies enable Google to create more comprehensive user profiles by connecting web activity to authenticated accounts. Because the cookies mentioned above are third-party

17

cookies, the data collected does not remain within the originating website (such as Defendant's website) rather, it is transmitted directly to Google's advertising infrastructure for purposes such as ad personalization and measurement.

55. In this case, the '3PSID', '3PAPISID', and '3PSIDCC' cookies are used to identify Watson Clinic patients by linking their browsing activity to their Google account. The values of these cookies are unique to each account holder and persist across sessions and devices.

56. When creating a Google account, users are required to provide an email address, meaning that the data collected alongside the '3PSID', '3PAPISID', and '3PSIDCC' cookies (such as user communications on Defendant's website) can be linked by Google to an identifiable email address. When registering for a Google Account, users also provide their full name, phone number, home address, work address, and a profile photograph.

57. Google can associate data collected alongside the cookies, not only with an email address, but also with a patients' name and other details, thereby allowing it to link a patient's private communications to their name and real world identity.

58. Once the Google Analytics Tracker intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the 3PSID, 3PAPISID, and 3PSIDCC cookies to associate this data with unique user identifiers, from which it can link website interactions to

18

individual user profiles and track users across multiple different websites, sessions, and devices when signed into their Google accounts.

59.    The Google Analytics Tracker can also set a different type of cookie, known as the NID cookie, which is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, and the NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads even if the user is not signed into a Google account on that browser. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as Defendant's. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."[13]

---

[13] *See* Google, Privacy Policy, https://policies.google.com/privacy/embedded?hl=en-US (last accessed June 17, 2026).

60. The Tracking Tools the Watson Clinic installed enables advertisers and companies, including the Watson Clinic, to benefit from Google's advertising ecosystem, and the data secretly collected from patients helps create targeted ads.

61. These Tracking Tools are often offered for "free," when they are in fact a bartered exchange whereby the Watson Clinic gets access to low-cost advertising and related services in exchange for its patients' Private Data.

62. For example, the Tracking Tools deployed on the Website intercepted the contents of patients' communications, including full-string URLs, page views, clicks, form submissions, and other defined actions, which are categorized as web "events" that the Watson Clinic surreptitiously programmed .

63. The Watson Clinic essentially encourages patients to use a tapped device, and once the Website loads on the patient's browser, the software-based wiretap quietly waits for patients' private communications to trigger the tap, which then intercepts those communications and transmits them to Google.

64. Notably, transmissions only occur on webpages that contain Tracking Tools.[14] Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

---

[14] "Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics% 20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited June 17, 2026).

**D. The Watson Clinic Disseminated Patient Information Via Its Website.**

65.    When a patient uses www.watsonhealth.com to book an appointment, the Website directs them to communicate Private Information via the "Physician & Provider Search" webpage, including by typing the physician's last name, gender, specialty, location, and the "accepting new patients" box.

66.    Unbeknownst to patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Tracking Tools that share the user's Private Information with Google as they move through the process of identifying a medical provider and booking treatment.

67.    The image below shows what happened when a patient used the "Physician-search" tool on the Website to find a physician specializing in treating "surgical oncology."

*Figure 2. Screenshot demonstrating how the how the "Physician & Provider Search" tool transmit Private Information to Google.*

68.    Figures 3 and 4 below show the "behind the scenes" portion of the Website that is invisible to patients. Notable, the phrase "Male Surgical Oncology Physician at Any Location" is transmitted to Google alongside identifying cookies.

22



*Figure 3. Screenshot of network traffic taken from Defendant's Website, which shows the live transmission of patient inputs being sent to "https://anayltics.google.com," thus evidencing that Google Analytics is installed on Defendant's Website.*

69.   The '3PSID,' '3PAPISID,' '3PSIDCC' cookies shown in Figure 4 allow Google to link the patient's communication to their specific Google account, which reveals details about their real-word identity. The fourth cookie shown in Figure 4 is the 'NID' cookie, which allows Google to identify specific users and link them to their online activity even if they are not logged into Google and/or do not have a Google account.



*Figure 4. This screenshot corresponds to Figure 3 and shows which cookies were transmitted to Google as the patient used the Website to find a physician.*

85.   The Website also allows patients to book an appointment by clicking the "Schedule An Appointment" button.

86.   When a patient selects one of the physicians shown in their search results (Figure 2), they click the "view full profile" button, which redirects them to the physician's specific webpage.

87.   For example, Figure 4 below shows what a patient sees upon selecting Dr. Danny K. Barrak ("Dr. Barrak").



*Figure 4. Screenshot of Defendant's "Physician Search" subpage wherein the patient has clicked the on the "view full profile" button of one of Defendant's Providers, Danny K. Barrak, via the process outlined above.*

88.   Next, the patient clicks the "Schedule An Appointment" button, and the Website redirects them with further instructions.

25

89.    Upon clicking the "Schedule An Appointment" button, the patient's info is transmitted to Google, and the information Google receives includes the fact that the patient started scheduling an appointment, specific doctor's specialty, and other "Physician Search" inputs that were communicated to the Watson Clinic.

90.    Figures 5 and 6 below illustrate what information Google received as a result of the Watson Clinic's decisions to install and configure Tracking Tools. The following phrases were transmitted to Google: "Dany K. Barrack," "General Surgery, Surgical Oncology," "appointment-scheduling," and "Oncology-Hematology Doctors & Physicians in Lakeland, Florida – Watson Clinic."



*Figure 5. Screenshot of network traffic taken from Defendant's Website.*

26



*Figure 6. Screenshot of network traffic taken from Defendant's Website when the patient begins scheduling an appointment.*

91. Once again, Google receives medical information alongside identifying cookies and device identifiers.

92.    In addition to transmitting the Healthcare provider's information and specialty, when a patient clicks on the "Schedule An Appointment" button on the "Physician-search" sub-page, the Tracking Tools employed by Defendant automatically transmits the fact that they booked an appointment.

93.    Patients also use the Website's "Specialties and Services" tab (located on the homepage) to communicate information and receive information about available treatments, procedures, and specialties. This portion of the Website also contains details such as clinic locations, contact numbers for scheduling appointments, operating hours and related information.

94.    For example, if a patient is seeking a mammogram, they may click on the "Breast Health Service" section on the "Specialties and Services" tab on Defendant's Website.



*Figure 7. Screenshot of Specialties and Services tab on Defendant's Website homepage wherein the patient has clicked the on the "Breast Health Services" sub-page.*

95.    As seen in Figure 8 below, this information is transmitted to Google, and it receives the phrase "Breast Health Services" alongside identifying cookies.[15]



*Figure 8. Screenshot of network traffic taken from Defendant's Website, which shows the live transmission of a patient's communications to Google when they click on the "Breast Health Services Button" on the "Specialties and Services" tab on the Homepage of Defendant's Website.*

96.    Making matters worse, the text and phrases that patients type into the Website's search bar are also transmitted to Google alongside identifying cookies and device identifiers.  free-text search bar located on the top right corner of the Website's homepage.  The free-text search bar allows a patient to search for among other things, for information about diseases and mental ailments within Defendant's database.  Once, a patient actually clicks on the search icon, near the "Patients corner" tab the Website brings the patient to a list of related articles that

---

[15] This is done in the exact same manner as seen above through the utilization of the unredacted URLs and third-party cookies to link the URLs to patients.  In this particular situation, the transmission from Defendant to Google is evidenced by the decoded unredacted URL on the top right of Figure 8, which reads "services/breast-health-services."

implicate the disease or ailment that they put into the free text bar. The patient then can actually click on the article to view it.

97.    As shown in Figures 9 & 10, the exact text and phrases that patients communicate to the Watson Clinic are transmitted to Google.



*Figure 9.   Screenshot of the Website's search bar wherein the patient has typed in the word "depression."*



*Figure 10. Screenshot showing that, upon clicking the search button, the exact phrase the patient typed ("depression") was transmitted to Google and categorized as a "search."*



*Figure 11.   This screenshot corresponds with Figure 10 and demonstrates that the domain* [https://analytics.google.com](https://analytics.google.com) *received     this     info     from "https://ww.watsonclinic.com.*

98.     Any subsequent communications the patient makes during the search are also are transmitted to Google via the Watson Clinic's Tracking Tools, including page titles and more.

99.    Patients also use the Website to register for classes, and upon doing so, their Private Information is sent to Google. For example, when a patient registers for the "Breast Feeding Basics Class," the course information is transmitted to Google as soon as they click  the button titled "Click here to register for this class."



*Figure 12. Screenshot taken from Defendant's Website, wherein the patient clicked on the "Breastfeeding Basics Class," and then clicked on the "Click here to register for this class" button.*

99.    Unbeknownst to the patient, upon clicking the "Breastfeeding Basics Class," Defendant transmitted that communication to Google. Once again, as seen in Figure 19 below, this was done via Google Analytics.

33



*Figure 13. Screenshot of network traffic demonstrating what is transmitted behind the scenes when a patient registers for a medical course.*

100. Lastly, a patient can log-in to MyChart via the Website by navigating

to the home page and clicking the button titled "Patients Corner" button on the top

34

of the Website's homepage. During this process, the Watson Clinic discloses the fact that an individual is logging into MyChart, and Google receives this info alongside identifying cookies and device information such that they can identify the specific individual as a Watson Clinic patient logging into MyChart.



*Figure 14. Screenshot of network traffic taken from Defendant's Website while logging into the Patient Portal via the Website.*

101.    Defendant did not disclose that its Website, tracks, records, and transmits patients' Private Information to Google, and Plaintiff was not aware of this when she used the Website in conjunction with the ongoing medical care and treatment she received from Defendant.

102.    Defendant never received written consent or written authorization to disclose Plaintiff's and Class Members' Private information to Google via the Tracking Tools.

103. At present, Plaintiff is unaware of additional Tracking Tools or additional Unauthorized Recipients. However, the presence of Google Analytics suggests that Defendant's data sharing practices are likely broader in scope. At a minimum, the use of Google Analytics suggests that Google Tag Manager, Google Ads, DoubleClick, and related tools are relevant to Plaintiff's and Class Members' claims.

### E. Plaintiff B.D's Experience

104. Plaintiff B.D., as patient of the Watson Clinic, has paid for and received healthcare services from the Watson Clinic from 2018 to present.

105. Plaintiff B.D. has accessed and used Defendant's Website to communicate her Private Information to Defendant on numerous occasions since 2018.

106. Plaintiff B.D. has had a Google account since at least 2009, and she stays logged into her Google account on her devices.

107. Since 2018, Plaintiff B.D. has sought and received medical treatment from the Watson Clinic, and her medical record includes visits to several specialists at different locations. More specifically, Plaintiff B.D. has: (1) had appointments with Watson Clinic Dermatologists for Psoriasis and Acne treatments; (2) received care related to ADHD, including prescriptions; (3) received care from an OBGYN regarding a lactation consultation and related medical care; (4) received care from a Plastic Surgeon in relation to a Plastic Surgery Consultation; (5) received additional Surgical Consultations; (6) was treated by a Podiatrist for an infection;

(7) sought treatment for heart palpitations, which included an EKG; and (8) was treated by an Urgent Care specialist for a bladder infection.

108. Plaintiff B.D. has used the Watson Clinic's Web Properties to do the following: (1) identify specific doctors and specialists via the "Physician search" subpage; (2) login to MyChart; (3) make appointments with doctors and specialists, including those mentioned in paragraph 107, via the "Schedule An Appointment" button embedded in the "Physician search" subpage; and (4) to pay bills.

109. Additionally, on many occasions, Plaintiff B.D. has used the "Specialties and Services" tab on the Website's homepage to find locations, learn about specific treatments for her medical conditions, and find related services.

110. Because the Watson Clinic used Tracking Tools, Unauthorized Parties, including Google, received Plaintiff B.D.'s PHI and PII as she communicated with the Watson Clinic via the Website.

111. As Defendant's patient, Plaintiff B.D. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff B.D. would not have disclosed her Private Information to Defendant via its Website.

112. As Defendant's patient, Plaintiff B.D. would never consent to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties such as Google, to access or interpret such information.

37

113. During the same transmissions, the Website routinely provided Unauthorized Parties with its patients' IP addresses, device IDs, and/or user accounts or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. The information that Google received from the Watson Clinic, including Plaintiff B.D. and Class Members' communications, were not anonymous.

114. After intercepting and collecting this information, Google processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the patient is a Google user, like Plaintiff B.D., Google is able to identify the patient.

115. In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Google and other Unauthorized parties, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

116. Plaintiff B.D. suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

117. Plaintiff B.D. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interesting in knowing which Unauthorized Parties—aside from Google—have received her PII and PHI since she first started using the Website in 2018.

## H. Defendant's Conduct Is Unlawful and Violated Industry Norms

### *i. Defendant Violated HIPAA Standards*

118. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[16]

119. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[17]

120. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is

---

[16] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[17] HHS.gov, HIPAA For Professionals, https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html (last visited June 06, 2026).

"transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

121.   IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

122.   Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

      a.  Names;

      ***

      H. Medical record numbers;

      ***

J.  Account numbers;

\*\*\*

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O.  Internet Protocol (IP) address numbers; ... and

R. Any other unique identifying number, characteristic, or code...;and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

123.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

124.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person ... shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

125.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

126.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

127.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[18]

128.    In its guidance for Marketing, the HHS further instructs:

---

[18]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June. 03, 2026).

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[19]

129. As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[20]

130. The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

131. Defendant's actions violated HIPAA Rules per this Bulletin.

### ii. Defendant Violated Florida Law

132. Florida law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

---

[19]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June. 12, 2026) (emphasis added).

[20] *See* HHS.gov, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June. 12, 2026).

133. Florida law provides in Fla. Stat. Ann. § 456.057 that health records may only be used or disclosed consistent with prior authorization or without such authorization in particular circumstances.

134. Defendant's disclosure of PHI by use of Tracking Technologies does not fit within any prior authorization or circumstances provided in Fla. Stat. Ann. § 456.057.

135. Defendant's actions described herein violated Florida law.

### *iii. Defendant Violated Industry Standards*

136. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

137. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

138. AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care... Patient privacy encompasses a number of aspects, including, ... personal data (informational privacy)

139. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only

provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

140.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically...must...:(c ) release patient information only in keeping ethics guidelines for confidentiality.

## I.   Plaintiff's and Class Members' Expectation of Privacy

141.   Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

142.   Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with Unauthorized Parties for a commercial purpose, unrelated to patient care.

143.   Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to Unauthorized Parties.

## J.   IP Addresses And Identifying Cookies Are PII

144. Defendant's use of Tracking Tools, disclosed and otherwise assisted Unauthorized Parties with intercepting Plaintiff's and Class Members' IP addresses, identifying cookies, and other persistent identifiers.

145. An IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

146. Under HIPAA, an IP address is considered PII.

147. HIPAA also defines PII to include "any unique identifying number, characteristic or code," and the identifying cookies that Google received in this case fall within this category of PII. *See* 45 C.F.R. § 164.514

148. Consequently, Defendant's practice of divulging patients' Private Information to Google via the Tracking Tools violates HIPAA and industry privacy standards.

## K. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures

149. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the

46

Private Information of its patients, Defendant is compensated by Google in the form of enhanced advertising and analytics services and more cost-efficient marketing on its platform.

150.   Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

151.   By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Florida law.

### L.  Plaintiff's and Class Members' Private Information Had Financial Value

152.   Plaintiff's data and Private Information has economic value. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

153.   Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep

47

increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

154.   The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[21]

155.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[22]

156.   Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[23]

---

[21] *See* https://time.com/4588104/medical-data-industry/ (last visited June 03, 2026).

[22] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited June 03, 2026).

[23] VERO, HOW TO COLLECT EMAIL ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited June 03, 2026).

157. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

158. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

159. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

## TOLLING

160. Any applicable statute of limitations has been tolled by the "delayed discovery" rule.

161. Shortly before this complaint was filed, Plaintiff, through the investigation of undersigned counsel, learned about Defendant's unlawful

49

disclosure and transmission of her Private Information to third parties, such as Google, in the manner described herein.

162. Prior to the date, Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed to Google because Defendant kept this information secret and the Tracking Tools are invisible on the Website.

## CLASS ACTION ALLEGATIONS

163. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

164. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

In the alternative, Plaintiff seeks to represent an "Florida Class" defined as:

> All individuals residing in Florida who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

The Nationwide Class and Florida Class are collectively referred to as the "Class."

165. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any

50

Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

166. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

167. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed via Defendant's Tracking Tools, and the Class is identifiable within Defendant's records.

168. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

    b. Whether Defendant had a duty not to disclose its patients Private Information to Unauthorized Parties;

    c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google for marketing purposes;

    d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been divulged;

e.   Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g.   Whether Defendant's conduct violated the Florida law regarding disclosure of patient records, Fla. Stat. Ann. § 456.057;

h.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

169.   Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of Tracking Tools, due to Defendant's misfeasance.

170.   Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff

52

has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

171. <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

172. <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges

on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

173. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

174. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

175. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

176. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to

54

refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

177. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

178. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

      a. Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information to companies that have not executed a HIPAA-compliant business associate agreement;

      b. Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information without first obtaining their express authorized consent;

      c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d.      Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.      Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google;

f.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information communicated via its Website;

g.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT
### (On Behalf of Plaintiff and the National Class)

179.   Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

180.   The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq*. The FSCA begins with legislative findings, including:

On the basis of its own investigations and of published studies, the Legislature makes the following findings. . .(4) [to] safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

181. FSCA § 934.03(1) imposes liability on any person who (a) "[i]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication;" (b) "[i]ntentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when . . . [s]uch device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication . . .;" (c) "[i]ntentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;" and (d) "[i]ntentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception wire, oral, or electronic communication in violation of this subsection."

182. FSCA § 934.10 provides, in pertinent part, as follows:

Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts,

57

discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

183.    The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

184.    Defendant is a person for purposes of FSCA § 934.03.

185.    Under the FSCA, a defendant must show it had the consent of all parties to a communication.

186.    At all relevant times, Defendant intentionally incorporated third parties' Tracking Technologies (including those from Google), on its Website that, without the knowledge and consent of Plaintiffs and Class Members, tracked and transmitted the substance of their confidential communications with Defendant to Google and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

58

187. Defendant intentionally procured third parties, including at least, Google, to track and intercept Plaintiffs' and Class Members' internet communications via Defendant's Website, including the contents thereof—*i.e.*, the full-string URLs of webpages visited, the medical information submitted via Defendant's Website subpages and more. Such information not only constitutes protected health information, but it also represents the substance, import, and meaning of the communications Plaintiffs and other Class Members had with Defendant via Defendant's Website.

188. Defendant intentionally disclosed to these third parties, including at least Google, the contents of Plaintiffs' and Class Members' internet communications via Defendant's Website, knowing that these communications were obtained through the interception by third parties' Tracking Technologies that Defendant itself incorporated into its Website.

189. Defendant intentionally used the contents of Plaintiffs' and Class Members' internet communications via the Defendant's Website for its own benefit, including for advertising, analytics, and marketing purposes, knowing that these communications were obtained through the interception by third parties' Tracking Technologies that Defendant itself incorporated on its Website.

190. Plaintiffs and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website based on, amongst other things, the nature and sensitivity of the categories of information communicated to Defendant.

191. Defendant failed to disclose, and continues to fail to disclose, its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' communications with Defendant to undisclosed third parties.

192. The private information that Defendant transmitted constitutes PHI.

193. As demonstrated hereinabove, Defendant violated the FCSA by procuring third parties to intercept its users' online communications in real time as they were made via the Website, disclosing these communications to the third parties through the Tracking Technologies, and using these communications for its own business purposes. Importantly, Google, and other unauthorized third parties would not have intercepted or received the contents of these communications but for Defendant's actions and incorporations of the Tracking Technologies into its Website.

194. By intercepting, disclosing, and using Plaintiffs' and Class Members' private and health-related information, Defendant violated Plaintiffs' and Class Members' statutorily protected privacy rights.

195. As a result of the above violations and pursuant to FSCA § 934.10, each Plaintiff and Class Member is entitled to actual damages or liquidated damages of $1,000 or $100 per day for each day of violation, whichever is higher.

196. Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive

damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT II
## VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
## 18 U.S.C. § 2511(1) *et seq.*
## UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
## (On Behalf of Plaintiff and the Class)

197.    Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

198.    The ECPA protects both sending and receipt of communications.

199.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

200.    The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

201.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,...data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system

61

that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

202. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

203. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

204. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a. Plaintiff's and Class Members' browsers;

    b. Plaintiff's and Class Members' computing devices;

    c. Defendant's web-servers; and

    d. The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

205. By utilizing and embedding Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person

to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

206. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Unauthorized Parties including Google.

207. These intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' that contain PII and PHI.

208. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to Unauthorized Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

209. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

210. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws

of the United States or of any State – namely, violation of the FSCA, invasion of privacy, among others.

211.   Defendant intentionally used the wire or electronic communications to increase its profit margins. For example, this not only bolstered its marketing efforts, it allowed Defendant to use a free and/or low-cost analytics tools in lieu of HIPAA-compliant business and marketing solutions.

212.   In doing so, Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

213.   Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

214.   Plaintiff and Class Members did not authorize Defendant to acquire the contents of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools.

215.   Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

216.   In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, and also constitutes a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

## COUNT III
## BREACH OF CONFIDENCE
### (On behalf of Plaintiff and the National Class)

217.    Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

218.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

219.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

220.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Tools to disclose and transmit Plaintiff's and Class Members' communications, including Private Information, to Unauthorized Parties.

221.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

222.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

223.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and

communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

    i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

66

## COUNT IV
## INVASION OF PRIVACY
### (Intrusion upon Seclusion)
### (On Behalf of Plaintiff and the National Class)

224.   Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

225.   The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

226.   Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to Unauthorized Parties.

227.   Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

228.   Defendant's surreptitious recording and transmission of Plaintiff's and Class Members' Private Information to Unauthorized Parties, including Google, a social media and marketing giant, is highly offensive to a reasonable person.

229.   Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their

67

person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

230. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

231. Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to disseminate patient's communications with the Website for marketing and advertising as opposed to legitimate medical purposes.

232. Because Defendant intentionally and willfully incorporated the Tracking Tools and encouraged patients to use the Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

233. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and Class Members was disclosed to Unauthorized Parties, causing Plaintiff and the Class to suffer damages.

234. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

235. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Google and the wrongful disclosure of the information cannot be undone.

236. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Google who on information and belief continues to possess and utilize that information.

237. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the National Class)**

238. Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and brings this Count individually on behalf of the proposed Class.

239. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

240. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class

Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

241. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

242. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

243. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the National Class)

244. Plaintiff repeats the allegations contained in paragraphs 1-162 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

245.    As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care.

246.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

247.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

248.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

249.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.      For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.      For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.      For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

DATE: July 10, 2026                    Respectfully Submitted,

_/s/ Mariya Weekes_
Mariya Weekes (FL State Bar No. 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131

72

Tel: (786) 206-9057
Fax: (786) 879-7520
Email: mweekes@milberg.com

*Counsel for Plaintiff and the Proposed Class*